ALLEN BEADLE

*v.*

STATE OF TENNESSEE

(*Nashville,* December Term, 1957.)

Opinion filed February 6, 1958.

J. SHELBY COFFEY, JR., and T. E. HUMPHREY, Columbia, for plaintiff in error.

THOMAS E. FOX, Assistant Attorney General, for the State.

MR. JUSTICE BURNETT delivered the opinion of the Court.

Beadle was indicted for murder. He was convicted for voluntary manslaughter and sentenced to serve a maximum of two years in the State Penitentiary. It is from this conviction that we have the present appeal.

The plaintiff in error's wife had, sometime prior to the date of the homicide which was on September 24, 1956, left him and gone to live with the deceased, one Joe Troope under the guise of cooking for him. She lived with him for some weeks prior to the homicide on South Main Street in Columbia, Tennessee.

Meantime the fourteen-year-old son of the plaintiff in error and this woman had come from the State of Ohio, where the parties formerly lived, to Columbia. After visiting with his mother for a few minutes and finding

that she was not living with his father, he went out to the country to relatives of the father where the father was living. In a short time he started to school and it seems that the other youngsters at school teased him and made some fun about this (i.e., his mother living with another man), to the boy. As a result of this he went to his father and asked him if he could do something about the mother living with Troope. He wanted the father and mother to live together.

As a result of this conversation the father went in to Columbia to see Troope and the mother. Later, on the day of the homicide, he went back again arriving at the apartment of Troope and the wife of the plaintiff in error, about 10:15 o'clock in the morning. It seems that after some conversation Troope and the wife of plaintiff in error agreed that the wife was to get a divorce from the plaintiff in error so that it would not be embarrassing to their young son any further. After they had agreed that the wife would get this divorce the husband asked that Troope and his wife quit living together, so that it would not embarrass the child, until after the divorce was granted. This apparently did not suit Troope nor the wife and various words were said about it. According to the plaintiff in error, Troope went out of the house and invited the plaintiff in error outside. The plaintiff in error did not go. Troope came back in the house and as he came in the door to the room where the plaintiff in error was sitting, the plaintiff in error withdrew his gun from his pocket and shot the deceased, Troope, one time in the chest. He immediately fell over on his right side and was dead when they came and examined him.

There was found in the pocket of the deceased a long sharp butcher knife with a blade of some 4½ or 5 inches. The record though does not indicate or even infer that the blade of this knife was sticking in the man. The only possible inference from the record is that the shot into the chest was what killed the man.

The plaintiff in error knew when he came in town that morning that he was going to see Troope. Troope had a bad reputation of being overbearing and had whipped a few people and sent word or said to others, which message had been communicated to plaintiff in error, that if he saw him he would kill him if he did not like what he, Troope, was doing. It was for this reason that the plaintiff in error when he came in town that morning had put the pistol of one of his relatives into his pocket.

The plaintiff in error's defense of course is necessary self defense. He, through his testimony makes out a very good case of self defense, but there is other testimony in the record particularly that of the wife which clearly would justify the jury in bringing in the verdict of voluntary manslaughter. Under all of the facts and circumstances in the case it seems that the jury really were more or less sympathetic with the plaintiff in error and gave him the very least sentence that they could under the evidence.

As said above the plaintiff in error testified in his own behalf and admitted this shooting but it was his position that this was done in his own necessary self defense. This question was submitted to the jury and the jury were properly charged as to this defense, that is, self defense. The jury is the judge of the law as given by the court, in other words the court acts as a witness as

to what the law is in a criminal case and the jury are the exclusive judges of the facts. The question of self defense is a fact question. This matter was properly submitted to the jury and the jury determined this issue against the defendant under evidence which is adequate, abundant and sufficient to support their verdict.

We do not approve the practice of a directed verdict in a criminal case in this State on behalf of an accused. *Knowing v. State,* 176 Tenn. 56, 138 S.W.2d 416.

It is argued that the district attorney general in his concluding argument to the jury made inflammatory statements to the jury which were not in the evidence. The argument of the district attorney general is not in the record. The part complained of is that it is said that he told the jury, "the defendant Beadle took this little girl and ruined her life and made her what she is today". From argument of counsel and under this record this statement was made by the district attorney general in reference to Beadle and his wife. Apparently there must have been something under the circumstances to cause the district attorney to make such a statement. This statement though even if it were properly certified to by the trial judge and in the record would not be cause for reversal. We feel that here such a statement, under the facts of this case, would at least be harmless error under our Harmless Error Statute (27-116 and 117, T.C.A.).

Lastly it is very earnestly and capably insisted by counsel for the plaintiff in error that the trial judge committed reversible error in refusing to appoint a court reporter to take the case as it was being tried and make a transcript of the record for appeal. This assignment is based upon the argument and reasoning that in failing

to do so the plaintiff in error, being a pauper, did not have the same protection in an appellate court as did a man who could pay for a bill of exceptions and therefore that he was denied due process and equal protection under those clauses of the Fourteenth Amendment of the United States Constitution.

This argument and the basis for this assignment is the case of *Griffin v. People of State of Illinois,* 351 U.S. 12, 76 S.Ct. 585, 590, 100 L.Ed. 891.

This case held that the Federal Constitution did not require a State to provide a bill of exceptions to the appellate court or for the purpose of allowing a review at all.

"But that is not to say that a State that does grant appellate review can do so in any way that discriminates against some convicted defendants on account of their poverty."

The Court went on then to say that if a person who has the money can provide a transcript and it is necessary to have this transcript so that the errors of the lower court may be reviewed then there is a discrimination where a transcript is not provided for by the State for these poor people. Of course all of us in our law school days were grounded in the basic principles as set forth in the Magna Charta. The fact of the matter is the writer of this opinion remembers very well that on his State Bar Examination in 1920, this was one of the questions as well as to the date of the Magna Charta, 1215.

The Supreme Court of the United States though did not say that it was necessary to have a stenographic report of transcript of the record. The Court said:

"We do not hold, however, that Illinois must purchase a stenographer's transcript in every case where a defendant cannot buy it. The Supreme Court may find other means of affording adequate and effective appellate review to indigent defendants."

In the instant case counsel have prepared a narrative bill of exceptions (one of the best that the writer of this opinion has ever privileged to read) and this narrative bill of exceptions clearly sets out what each witness had testified, the entire technical record and the charge of the Court. This plaintiff in error does have a sufficient transcript to amply protect him under all his rights herein.

Counsel for the State cites the case of *Miller v. United States,* 317 U.S. 192, 198, 63 S.Ct. 187, 87 L.Ed. 179, 183, wherein the Supreme Court of the United States approved a narrative bill of exceptions. The rules of this Court as set forth in the appendix to 185 Tennessee at page 859, clearly indicate to us that it is the preference of the Court to have narrative bills of exceptions. Narrative bills of exceptions so frequently and generally do set forth all of the pertinent matters that are necessary for the court to see on review. Where there are any technical questions as to the admissibility of evidence the questions and answers then can be set out more in detail with the exceptions and these things answered.

The first paragraph of Rule I, is,

*"Abridgment of the record*—Counsel are required in all cases, when practicable, to abridge the records to be certified on an appeal, or an appeal in the nature of a writ of error, to this court, by stipulation; eliminat-

ing all pleadings, testimony, orders, and other parts of the record, which do not bear upon or affect the rights of the parties and the questions to be here determined.''

The rules then go on and set forth various and sundry things that are to be done. As is said above this narrative bill of exceptions, in this case, is exceptionally well prepared and obviously from reading it takes care of all the rights of the plaintiff in error herein.

Counsel for the plaintiff in error were appointed by the court. They have done a fine job in carrying out their duties as officers of the court. These lawyers have done an excellent piece of work on behalf of this indigent man and have not stopped with the conclusion of the trial court but have both appeared here and made an excellent argument in this court. We must and do gladly compliment them on this fine work and in further carrying out their duties and obligations as members of the Bar and officers of this Court.

As a result of what has been said above the judgment of the trial court must be affirmed.